Japhis LAMPKINS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Tyrone BROOKINS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 15, 1982.
Decided: Aug. 2, 1983.

Joseph B. Green and Edmund M. Hillis (argued), Asst. Public Defenders, Wilmington, for appellant Lampkins.

Mary C. Boudart, Wilmington, and Neal A. Phillips (argued), Wilmington, for appellant Brookins.

Fred S. Silverman, Deputy Atty. Gen. (argued), Wilmington, for appellee.

Before HERRMANN, C.J., HORSEY and MOORE, JJ.

HERRMANN, Chief Justice:

In these appeals, the cases having been consolidated, the defendants seek reversal of their convictions for Murder in the First Degree (11 *Del.C.* § 636), Conspiracy in the First Degree (11 *Del.C.* § 513), Possession of a Deadly Weapon during the Commission of a Felony (11 *Del.C.* § 1447) and Burglary in the Second Degree (11 *Del.C.* § 825). Both defendants contend that the Trial Court committed reversible error in denying their motions for severance. Defendant Lampkins further contends that the Court abused its discretion in admitting evidence of a statement which he gave to police shortly after his arrest. Defendant Brookins further challenges the Court's admission of certain physical evidence.

I.

The defendants, Japhis Lampkins and Tyrone Brookins, were indicted on the above charges in connection with the burglary of a Wilmington apartment and the killing, during the course thereof, of a resident of the apartment.

A.

At trial before a jury, the State presented evidence as follows:

Fifty-nine year old Mary Dugan (hereinafter "victim") lived with her son in an apartment at 1409 Delaware Avenue in Wilmington. On April 2, 1980, about noon, the victim telephoned her son at work, as was her custom. During the conversation, the son asked his mother to shop for groceries at a local supermarket. At approximately 3:00 p.m., a police officer responded to a "woman screaming" complaint at the victim's apartment house. The officer entered the victim's apartment through an open door after his call went unanswered. Upon entering the living room, the officer saw the victim on the floor, blood flowing from the left side of her face, her mouth opening and closing, her eyes fluttering. Standing nearby was her shopping cart with two bags of groceries. Alongside her body were several of her kitchen knives, including one from which the blade had been broken off. Another knife was lodged, up to its handle, in the victim's left buttock. Her panties lay beside her. The

officer called immediately for an ambulance. The victim was pronounced dead at the hospital.

The Medical Examiner who performed the autopsy testified that the condition of the victim's head and face was "awful." His examination revealed that she was repeatedly stabbed in the face, struck on the head with a blunt instrument, and strangled to the extent that blood vessels in her eyes burst. In addition to her head wounds, she had stab wounds in her chest, abdomen, back, and crotch. She was stabbed 23 times. The Medical Examiner testified that any one of several of the wounds would have been fatal, including the blow to the head, the stab wound in the heart, and asphyxiation from strangulation. The Examiner concluded that, based on the number, nature and location of her wounds, the victim had been attacked by more than one person. The Medical Examiner also testified that a wound, as depicted in a photograph of Brookins' right hand taken on April 11, 1980, was consistent with having been caused by a knife with handle breaking off while being used in stabbing a person; that the wound had occurred within 2 weeks prior to the photograph.

Thomas M. Butler was indicted with the defendants for Conspiracy in the Second Degree (11 *Del.C.* § 512). Prior to trial, Butler plead guilty to Manslaughter (11 *Del.C.* § 632) and the Conspiracy charge. In return, he testified for the State against both defendants.[1]

Butler testified as follows: On the morning of April 2nd, he and Lampkins committed an armed robbery in Newark and separated upon their return to Wilmington. In the afternoon, he again met Lampkins, this time with Brookins. Brookins was a drug addict. The three men smoked marijuana and Brookins and Lampkins injected themselves with cocaine and "crank" (methamphetamine). Butler was "high" while Lampkins and Brookins were "messed up."

Knowing that Lampkins and Butler had committed a successful robbery earlier in the day, Brookins was anxious to "make a sting." The three decided to go to the nearby supermarket. There they saw the victim pulling her cart and followed her home. Butler waited outside while first Brookins, and then Lampkins, went into the victim's apartment. When Butler heard Lampkins' voice, scuffling, and a woman moaning, he fled.

Butler's testimony was corroborated in several ways:

An F.B.I. expert in hair comparisons testified that a hair found on the back door of the victim's apartment and a hair on a tissue found beside the victim were microscopically similar to Brookins' head hair and pubic hair, respectively. The expert testified that such dual hair similarities were rare for one individual.

A shoe print lifted from the bloody floor beside the victim was also examined by an F.B.I. expert. He testified that, although the print lacked clarity and sufficient detail to support a positive opinion, similarities existed both in the design and size of the footprint and the "sneaker" Brookins was wearing when he was arrested.

A blood-stained vase found on a chair near the victim was also introduced. A blood expert testified that the blood on the vase did not match the victim's blood; that it matched Brookins' blood type in all but one of the blood components. The examiner testified that although the variant component could indicate that the blood on the vase was not Brookins', he had never seen known and unknown samples match in all but one component. He testified that the sample manifesting the variant component could have been contaminated by the victim's blood; that such a mix or contamination would have "masked" the Brookins' component.

---

1. Butler was sentenced to the maximum penalty on each charge prior to the Lampkins-Brookins trial.

A police detective testified that, on April 10, 1980, he spoke with Lampkins' brother, Acey Lampkins, at the latter's request, and that Acey told him the following: that Acey had spoken with Butler shortly after the murder; that Butler told Acey that Butler and two others had followed a woman from a supermarket to her home along Delaware Avenue; that Butler said they knocked on the door and, when the woman opened it, stabbed her in the face; that his brother, Japhis, related substantially the same story to him.

Acey later recanted his statement, both to police and at trial. He conceded at trial, however, that his initial statement was wholly voluntary. He further testified that, prior to his recantation, he thought about the possibility of his brother receiving the death penalty if convicted.

Timothy Wright, Japhis Lampkins' nephew, testified that he had given statements to police on April 11, and April 14, 1980, regarding his knowledge of Lampkins' involvement in the murder. Wright testified that in the first statement he denied any knowledge of Lampkins' involvement but that he had not told police all he knew. In the second statement, Wright admitted to police that Lampkins told him he had followed an old lady from a supermarket to her house and robbed her. At trial, however, Wright recanted the statement, testifying that he never had such a conversation with Lampkins, that he made the statement only because of threats by the police "to lock [him] up," and that the statement was based not on his personal knowledge but on what the police told him regarding Lampkins' involvement.

A neighbor living above the victim's apartment testified that, just before the police arrived, she heard the apartment building's front door slam and saw a man running from the building dressed in white hat, blue denim pants, and blue denim jacket. A witness who had seen Lampkins and Brookins at the scene of the morning Newark robbery testified that one of the robbers, who matched Lampkins' description, was dressed almost entirely in dark blue and, at one point, put on a white hat.

So went the State's case.

## B.

At trial, both defendants testified in their own defense, each presenting a separate alibi.

Lampkins admitted committing the morning Newark robbery with Butler, but said that at the time of the killing he was across town cleaning his car. When the prosecutor pointed out to him that the car he claimed to have been cleaning was a rental car he had rented only a day or two earlier, Lampkins testified that sticky "cherry things" had dropped on the car the night before and he was concerned with liability for damage to the finish. When the prosecutor asked Lampkins what type of tree would be dropping anything at the beginning of April, he responded that it was "an evergreen." An expert called by the State testified that there were no trees or plants growing in New Castle County in general, or on the defendant's street in particular, which would have been producing a sticky substance in early April, 1980.

Brookins claimed that, at the time of the murder, he was shopping in downtown Wilmington with Debbie Benson, the mother of his children. At trial, Benson supported Brookins' alibi. In an earlier written statement, however, she had indicated that Brookins was with her until only 1:00 p.m. on the day of the murder; that he then told her he was going to a poolroom and she did not see him again until the evening.

Brookins explained that the cut on his hand was caused by falling on a piece of glass during a handball game with Eric Jones. Jones testified that although he told defense counsel he could substantiate Brookins' story, he did so because he had received a threatening phone call.

\* \* \*

The jury found the defendants guilty as charged. At the penalty hearing, they were sentenced to life imprisonment, with-

out possibility of probation or parole, upon the conviction of Murder in the First Degree; and to 5 years imprisonment upon the conviction of each of the other offenses.

Both defendants appeal.

## II.

Lampkins contends that the Trial Court abused its discretion in admitting evidence of a statement he made to police. The detective testified that, while he was questioning Lampkins in connection with several robberies unrelated to the instant case and before any mention by the detective of the instant homicide, Lampkins told him that he had witnessed an assault which largely resembled the commission of the offense in this case.[2]

Lampkins' statement was substantially as follows: In early January, 1980, he was forced at gunpoint into a car by a man he knew as "Dickey." A man Lampkins knew to be a drug dealer named "Spino" was in the back seat of the car next to a woman who had "dark hair with blond streaks." Lampkins did not know the man driving the car. Spino was Italian; Dickey and the driver appeared to be Spanish or Puerto Rican. They stopped at an apartment building at 8th and Adams Streets, followed a long walkway, and went up a few steps to the front of the building. Once inside a vacant apartment, the first apartment on the left, Lampkins was pushed toward the sole piece of furniture in the apartment—a dresser—and told to sit down. Spino then started beating, strangling, and stabbing the woman. With one hand around her throat, he punched her in the face with his other hand in which he held a knife; he then stabbed her in the chest.[3] Finally, Spino and the driver carried the woman out of the apartment and left Lampkins at his home with the admonition "this could happen to you."[4]

The Trial Court admitted Lampkins' statement (hereinafter "the Spino-Dickey statement") over defense objection as to its relevancy and prejudicial effect. The Trial Court found the statement relevant because of what it considered several parallels to the commission of the offense in this case, e.g., the description of the victim, the nature of the assault, and the description of the apartment building and apartment. Additionally, the Trial Court found that because the police had no record of such an incident occurring at 8th and Adams Streets, the account may be presumed fictitious. Lampkins, the Trial Court concluded, may have been trying by the statement to broach the subject of his involvement in this case by offering to police the fact of his mere presence and hoping that police would negotiate with him. The Trial Court further ruled that admission of the Spino-Dickey statement was not unfairly prejudicial because Lampkins had referred only to his presence as a passive witness under duress.

Lampkins renews his argument that the statement was not relevant under D.R.E. 401[5] and should, therefore, have been excluded under D.R.E. 402[6]; or, if relevant,

---

2. Lampkins later repeated the account in both a tape recording by police and his own written statement. References herein to "the statement" encompass the three accounts.

3. At trial, Lampkins surmised that the woman was selling drugs for Spino and had withheld proceeds from him. Additionally, he partially recanted his statement to police, testifying that Spino did not stab the woman, but merely punched her.

4. The reason for the warning was not clear: Lampkins suggested in the statement that it was meant to prevent him from talking to police. At trial, he testified that he also sold drugs for Spino and owed him money.

5. D.R.E. 401 provides:
   "RULE 401. DEFINITION OF RELEVANT EVIDENCE.
   "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

6. D.R.E. 402 provides:
   "RULE 402. RELEVANT EVIDENCE GENERALLY ADMISSIBLE; IRRELEVANT EVIDENCE INADMISSIBLE.
   "All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts

should have been excluded under D.R.E. 403 [7] on the grounds of unfair prejudice and tendency to confuse the jury. The statement was irrelevant, Lampkins asserts, because of various dissimilarities between the incident which he recounted and the State's version of the instant homicide.[8] He argues alternatively that, assuming the statement was even remotely relevant, its probative value was substantially outweighed by the danger of asking the jury to speculate as to its significance. We find these positions untenable.

■ A decision whether to admit testimony as relevant is within the sound discretion of the Trial Judge and will not be reversed absent a clear abuse of that discretion. *Thompson v. State,* Del.Supr., 399 A.2d 194, 198–99 (1979). We find no such abuse in this case. The Court's rulings are supported by the record. Moreover, prior false or inconsistent statements by the accused are relevant and may, within the sound discretion of the Trial Court, be admissible since the jury may infer therefrom that the statements were made to divert suspicion, or to otherwise mislead authorities, or to establish an alibi or innocence; hence, such statements are probative of guilt. *Commonwealth v. Cristina,* Pa.Supr., 481 Pa. 44, 391 A.2d 1307, 1312 (1978).

■ As to the prejudicial effect of the statement, Lampkins' reliance upon *Benson v. State,* Del.Supr., 375 A.2d 461 (1977), is misplaced. In *Benson,* this Court held that it was unfairly prejudicial to admit testimony regarding the defendant's predisposition to rape when he was on trial for burglary and conspiracy, because the testimony was neither relevant nor material to either of the charges at issue. *Id.* at 462. By contrast here, Lampkins' account contained sufficient significant similarities to both the charge at issue and the circumstances surrounding the commission of the offense to warrant its admission. The Trial Court did not abuse its discretion.

## III.

Brookins contends that the Trial Court committed reversible error in admitting into evidence samples of his head hair, pubic hair and blood, and the sneakers he was wearing at the time of his arrest.

## A.

■ As to the hair and blood samples: Police detectives secured search warrants for the hair samples while Brookins was in custody on an unrelated robbery charge. Shortly thereafter, based on the affidavit supporting the warrant for the hair sample and an additional affidavit, police obtained another warrant for blood samples.

Brookins moved to suppress both takings on the ground that the initial affidavit, used to support both warrants, contained "deliberately false statements or statements made with reckless disregard for the truth," which invalidated both the affidavit and the warrants under the rule of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), *reversing Franks v. State,* Del.Supr., 373 A.2d 578 (1977), *aff'd on rehearing sub nom. Franks v. State,* Del.Supr., 398 A.2d 783 (1979).

In *Franks,* the United States Supreme Court held that a defendant in a criminal proceeding, subsequent to the *ex parte* issuance of a search warrant, has a constitutional right to an evidentiary hearing to challenge the veracity of supporting affida-

---

of this State. Evidence which is not relevant is not admissible."

**7.** D.R.E. 403 provides:
"RULE 403. EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION OR WASTE OF TIME.
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or

by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

**8.** Lampkins points to the following dissimilarities: the date, time and location of the incidents; the description of the victims; the furnishings in the apartments; and the nature of Lampkins' role.

vits if the defendant makes a "substantial preliminary showing" that (1) the affiant included a false statement in the affidavit knowingly and intentionally, or with reckless disregard for the truth, and (2) the false statement is necessary to the finding of probable cause. The Court further stated:

"In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

98 S.Ct. at 2676.

At the suppression hearing, the Trial Court denied Brookins' preliminary *Franks* showing as "highly marginal" and "reaching for implications and innuendo," but permitted extensive cross-examination of the detective-affiant "in the interest of expedition." Brookins contended that the detective was "reckless with the truth" in the affidavit in two respects: (1) in his statement that Lampkins, in recounting the alleged Spino-Dickey incident, admitted being present when a woman was assaulted and "killed" in an apartment similar to the victim's apartment; and (2) in his recounting of a report from another police officer that one Paige Fossette told the officer that Lampkins and Brookins were known to be following women from supermarkets. At the hearing, the detective-affiant admitted that he was mistaken in asserting that Lampkins had witnessed a "killing," and Fossette denied he ever told police that Brookins and Lampkins were so involved.

In ruling upon Brookins' motion to suppress, the Trial Court followed the approach adopted by this Court in its reconsideration of *Franks* upon remand from the United States Supreme Court:

"Assuming for purposes of this case only that the defendant has met the requirements of ["a substantial preliminary showing"], we turn to the proferred evidence to determine that if by setting the alleged false paragraphs of the warrant affidavit aside there remains sufficient content to support a finding of probable cause."

*Franks v. State,* 398 A.2d at 785.

The Trial Court determined that, setting the alleged false paragraphs aside, the remainder of the affidavit contained sufficient significant allegations to establish probable cause, including, *inter alia:* Brookins and Lampkins were known associates; a boyfriend of Lampkins' sister told the detective-affiant that he saw Lampkins and Brookins together on the day before the homicide; Timothy Wright told the detective-affiant that Lampkins told him that he and two associates followed an old woman home from a supermarket and robbed her; adjacent to the victim's body were two full grocery bags and bloodstained footprints, the latter left by a rippled-soled boot similar to that worn by Lampkins; Negroid male hairs were found on the clothing of the victim, who was white; Brookins and Lampkins are both black males; eight residents of the neighborhood surrounding the victim's apartment identified Brookins as having been in the neighborhood during the week preceding the killing; three residents of the same neighborhood claimed to have seen a person of Brookins' description standing outside the victim's apartment building shortly before the victim's body was discovered; a resident of the apartment building claimed to see a person of Brookins' description running from the building shortly after screams occurred in the victim's apartment.

The Trial Court concluded that the above allegations link Brookins to the offense in terms of time, place, and relationship to a co-defendant who allegedly admitted to a relative his involvement in a similar offense; that, therefore, "the excised affidavit contained within its four corners suffi-

cient probable cause to secure the hair samples from Brookins." We agree.

\* \* \*

As to the blood samples: the Trial Court found that the additional affidavit provided a clear basis for obtaining the samples since it stated that two types of human blood were found at the crime scene in addition to the victim's blood type. The Court held that this allegation, viewed in conjunction with the unexcised portions of the earlier affidavit, furnished sufficient probable cause for the seizure of the blood. We agree.

### B.

As to the admission of Brookins' sneakers: Brookins was arrested on April 10, 1980 for his alleged involvement in a March 3, robbery of a market. During the robbery, a customer was struck over the head with a bottle which shattered. On the morning following the arrest, police detectives obtained a search warrant to seize Brookins' clothing in connection with the robbery, believing that glass particles from the bottle or blood from the customer would be found thereon.[9] The detectives seized Brookins' sneakers under that warrant.

The State planned to introduce the sneakers in the instant case for the purpose of design and size comparison with a footprint left in the blood beside the victim. Brookins moved to suppress the evidence, arguing that the warrant was fatally flawed because the affidavit did not establish probable cause to justify seizure in connection with the robbery. More specifically, Brookins contended (1) that the affidavit was defective in its failure to specify the clothing worn by the suspects at the time of the robbery; and (2) that the affiants' belief that evidence of the robbery would be present on his clothes five weeks after the incident was unfounded.

It follows, Brookins asserted, that the sneaker was seized as part of an illegal general exploratory search and that introduction of the shoes herein constituted impermissible use of "fruit of the poisonous tree."

The Trial Court denied Brookins' motion. The Court found that the affidavit sufficiently connected Brookins to the robbery because of the fingerprint identification. Additionally, the Court rejected the "staleness" argument, finding that while broken glass would not likely be embedded in a suspect's shoes five weeks after an offense, blood stains may well have become embedded in the porous surface of clothing—more specifically in the porous surface of the sneakers.

The record supports the findings of the Court. We are convinced that the affidavit did establish probable cause to connect Brookins with the market robbery. Further, as to the staleness argument: the Trial Court properly applied the "staleness" test of *Hooks v. State,* Del.Supr., 416 A.2d 189, 203 (1980), to determine "whether one would normally expect to find those items [glass particles and/or bloodstains] at that place [on the sneakers]. Thus, the Court found, and we agree, that one could reasonably expect to find blood in the porous surface of Brookins' shoes. Further support for this conclusion is found in the well-worn appearance of the shoes in this case and the likelihood that a person committing a robbery would wear a pair of shoes in which he could run. In short, although the police apparently did not know to a certainty which shoes Brookins was wearing at the time of the robbery, it was reasonable to believe that the sneakers he wore at the time of arrest could have been those shoes.

The gravamen of Brookins' argument on this facet of the appeal is that the seizure of the sneakers in connection with the rob-

---

**9.** The affidavit supporting the warrant stated: (1) that a robbery victim was hit with a bottle which shattered, injuring the victim; (2) that Brookins' fingerprints were found on a portion

of the bottle; and (3) that the clothing worn by Brookins at the time of the arrest "may possibly be those clothes worn during the robbery."

bery was "pretextual," i.e., that they were actually seized in connection with the homicide in this case without probable cause, at a time when the defendants were merely suspected of the homicide. The Trial Court stated the following:

> "If such probable cause existed, and the shoes seized came properly into the custody of the police, their later use as evidence linking the defendant to a separate offense does not invalidate the original seizure."

Thus the Court did not address expressly whether the "later use" was proper.

We have found that the search and seizure in connection with the robbery warrant were valid. Consequently, the defendants' reliance upon *State v. Miller*, Del.Super., 420 A.2d 181 (1980), a "pretext" case,[10] is to no avail.

■ Moreover, we hold that if, in the course of a lawful search, evidence of a crime is found, other than the crime for which the search was conducted or the accused arrested, the evidence may be seized and used against the accused in the trial of either offense. *Ramirez v. Rodriguez*, 10th Cir., 467 F.2d 822, 824 (1972), *cert. denied*, 410 U.S. 987, 93 S.Ct. 1518, 36 L.Ed.2d 185 (1973); *see Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus, the sneakers seized lawfully in connection with the robbery were properly admitted in the instant case.[11]

■ Brookins finally contends that the 10 hour period between the time of his arrest and the time of the seizure of the sneakers amounted to an unlawful detention requiring suppression of the evidence. The Trial Court found that the delay was reasonable. We agree and so hold. We further hold that *United States v. Edwards*, 415 U.S. 800, 805–06, 94 S.Ct. 1234, 1238, 39 L.Ed.2d 771 (1974) is controlling.

\* \* \*

The Trial Court committed no error in this facet of the appeal.

## IV.

■ Finally, as to the defendants' contention that the Trial Court committed reversible error in its denial of their motions for severance: the defendants, on the eve of trial,[12] moved for severance pursuant to Superior Court Criminal Rule 14.[13] Lampkins argued that he would be implicated and prejudiced unfairly by the introduction of the physical evidence against Brookins; Brookins contended that he would be implicated and prejudiced unfairly by the introduction of the evidence against Lampkins, primarily in the form of admissions.

The Trial Court denied the motion, stating that:

10. In *Miller*, police seized drugs from the glove box of the defendant's car during an inventory search following arrest for a traffic violation. The Trial Court held the search unreasonable and effectively "pretextual" where there was no probable cause to open the glove box. 420 A.2d at 184.

11. The State argues that the seizure of Brookins' clothing was alternatively justified as incident to a lawful detention following arrest. The Trial Court, having found the warrant proper, did not reach that argument, nor do we.

12. The Trial Court noted that although the defendants' cases had been pending in the Court since July, 1980, Lampkins and Brookins did not file their motions for severance until April 14, 1981 and April 15, 1981, respectively, approximately two weeks before the joint trial which was estimated to last approximately six weeks and require at least forty State witnesses.

13. Rule 14 provides:
"RULE 14. RELIEF FROM PREJUDICIAL JOINDER
"If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court may order the attorney for the State to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the State intends to introduce in evidence at the trial."

"The mere possibility that in a joint trial some evidence may be admitted against one defendant which is inadmissible against another is not, standing alone, a sufficient reason to require separate trials."

The Court concluded that the factors supporting a joint trial, i.e., the alleged common connection of both defendants to Butler, the conspiracy charge, and the expected complexity and length of the trial, outweighed any probable prejudice to either of the defendants.

At trial, the Court gave the jury the following cautionary instruction:

"There are two individual persons charged with the crimes set forth in the Indictment. In effect, there are two separate proceedings being tried together because of common facts. It is your duty to give separate consideration to the case of each individual defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant. Each defendant is entitled to have his case determined with respect to whether or not the State has shown beyond a reasonable doubt that he, individually, has committed the crime or crimes with which he is charged. The fact that you may find one of the accused guilty or not guilty of one of the offenses charged should not in any way control your verdict with respect to the guilt or the absence of guilt of the other accused."

Severance is a matter within the sound discretion of the Trial Court; and the defendant has the burden of demonstrating "substantial injustice" and unfair prejudice. *Bates v. State,* Del.Supr., 386 A.2d 1139, 1141 (1978). Both defendants argue that this case is governed by *Jenkins v. State,* Del.Supr., 230 A.2d 262 (1969). There it was held that the Trial Court abused its discretion in denying a motion for severance when to try the defendants together was effectively to try each upon the extra-judicial statement of the other, and thus to deny them the right to confrontation. *Accord, Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Jenkins,* this Court stated:

"What constitutes abuse of discretion depends upon the facts and circumstances of each case. As a general rule, however, it may be said that discretion has been abused by a denial of severance when there is a reasonable probability that, because of a co-defendants' extra-judicial statement, substantial injustice and denial of a fair trial may result from a joint trial.

"Ordinarily, an abuse of discretion will not arise from the mere fact that the confession or admission of a co-defendant, implicating the moving defendant and not admissible against him, will be introduced at the joint trial. Some other factor must be present, such as: (1) absence of other substantial competent evidence of the movant's guilt; (2) antagonistic defenses as between the co-defendant and the movant; and (3) difficulty of segregating the evidence as between the co-defendant and the movant." (Citations omitted.)

230 A.2d at 272–73.

Brookins argues that he was prejudiced unfairly by the admission of (1) the Spino-Dickey statement; (2) Lampkins' admission that he participated with Butler in several robberies prior to the instant homicide; (3) Acey Lampkins' testimony that Butler told Acey that he and two others followed a woman home from the supermarket; and (4) Japhis Lampkins' alibi testimony which was undercut by other witnesses.

Lampkins contends that the physical evidence introduced against Brookins, i.e., the head and pubic hairs, the sneaker footprint comparison, and blood on the vase, were all tantamount to an extra-judicial statement within the ambit of *Jenkins.*

Both defendants assert that the Trial Court's cautionary instruction was insuffi-

cient to remedy the prejudice resulting from the admission of the evidence.

*Jenkins* is, for several reasons, inapposite on its facts: First, as to the admission of the Spino-Dickey statement, Lampkins consistently denied that the statement was related to the instant homicide; consequently, we are not convinced that the statement rose to the level of a "confession or admission ... implicating the moving defendant." Nor do the remaining so-called "admissions" or testimonial evidence challenged by Brookins fall within the purview of *Jenkins.* Similarly, the physical evidence challenged by Lampkins is not vulnerable to attack under *Jenkins.* Second, both Lampkins and Brookins testified in their own defense. Accordingly, they did not lose the right to cross-examine one another, the right protected by *Jenkins* and later recognized in *Bruton v. United States, supra.* Third, no other factors were present in this case to compel severance, i.e., (1) there was other substantial and competent evidence against both defendants; (2) the defendants did not present antagonistic defenses; and (3) the jury faced no unreasonable difficulty in segregating the evidence as between the defendants. *Compare Jenkins, supra,* 230 A.2d at 273.

Finally, we are convinced that the Trial Court's cautionary instruction was, under the circumstances, sufficient to disarm any potential prejudice resulting from the admission, in the joint trial, of the evidence in question.

\* \* \*

There is no reversible error upon any ground of these appeals.

AFFIRMED.