HOLLAND, Justice.
The defendant-appellant, Tyrone Broo-kins (“Brookins”), appeals from the Superior Court’s judgment that denied his request for a new trial. In 1981, Brookins was convicted by a jury of Murder in the First Degree, Possession of a Deadly Weapon During Commission of a Felony, Burglary in the Second Degree and Conspiracy in the First Degree. Brookins was sentenced to life imprisonment without parole plus fifteen years imprisonment.[1]
In 2004, relying on DNA test results, Brookins moved for a new trial under Title 11, § 4504(b) of the Delaware Code.[2] The Superior Court denied Brookins’ motion. In this appeal, Brookins contends that the Superior Court committed reversible error in two respects: first, by denying his motion for default judgment because the State failed to request an extension in a timely manner; and second, by denying his motion for a new trial because it improperly failed to give sufficient weight to the DNA evidence, and improperly gave weight to irrelevant factors. We have concluded that all of Brookins’ contentions are without merit.
Facts[3]
On April 2, 1980, the victim, Mary Du-gan (“Dugan”), was killed shortly after entering her apartment. At approximately 3:00 p.m., a police officer responded to a *391 complaint regarding a “woman screaming” at Dugan’s apartment. While walking down the rear staircase of the building, the officer noticed that the rear door to Du-gan’s apartment was open. Upon entering the living room, the officer found Dugan’s body. Dugan had been beaten on the head, repeatedly stabbed and strangled. She was pronounced dead at the hospital.
Thomas Butler (“Butler”), a co-conspirator, testified against Japhis Lampkins (“Lampkins”) and Brookins in exchange for a plea of Manslaughter and Conspiracy in the Second Degree. Butler testified that on the morning of April 2, he and Lampkins committed an armed robbery in Newark, and then separated on their return to Wilmington. In the afternoon, Butler rejoined Lampkins, this time with Brookins, who was a drug addict. The three men then ingested various drugs. Knowing that Lampkins and Butler had committed a successful robbery earlier that day, Brookins also wanted to “make a sting.” The three decided to go to a nearby supermarket, where they saw Dugan pulling her cart. They followed her home. Butler waited outside while first Brookins, and then Lampkins, went into Dugan’s apartment. While outside, Butler heard Lampkins’ voice, followed by scuffling and a woman moaning, whereupon he fled.
Although no eyewitness testimony was presented at the trial, Butler’s testimony impheating Brookins was corroborated in several ways, including by expert and non-expert testimony and physical evidence. Specifically, hairs were found on the back door of Dugan’s apartment and on a tissue found next to Dugan. Those hairs matched Brookins’ head and pubic hair. A shoe print lifted from the blood-covered floor was similar in design and size to the shoe Brookins was wearing when arrested. Blood on a vase found on a chair near Dugan was determined not to be Dugan’s blood, but matched Brookins’ blood type and enzyme markers in all but one aspect.

Default Judgment Claim

A DNA analysis report dated July 15, 2004, showed that the blood on the vase was not that of Brookins, but that of Dugan. Relying on these DNA test results, Brookins moved for a new trial under Title 11, section 4504(b) of the Delaware Code. The trial judge ordered the State to respond to Brookins’ motion by October 11, 2004.
On October 7, the prosecutor to whom the case had been assigned wrote to the trial judge, asking for a 45-day extension to respond to the motion, because he “was not the original prosecutor” and “due to the age of the case.” Six days later, Broo-kins’ defense counsel wrote to the judge, objecting to the State’s request. The State’s response was filed on November 22, and on December 17, defense counsel filed a reply to the State’s answer.
In July 2005, Brookins filed a motion for default judgment, charging that the State’s response to the motion for a new trial was untimely, there being no indication that the Superior Court had ever granted the State’s request for additional time. The Superior Court denied Brookins’ motions for default judgment and for a new trial.
We review the Superior Court’s denial of Brookins’ motion for default judgment for abuse of discretion. Brookins first argues that the Superior Court “never made any inquiry or issued any decision on the request for continuance, and without doing so, cannot rationally make a decision on the motion for default judgment.” In Guardarrama v. State,[4] we held that “the trial court had the discretion to address *392 the merits of an even unopposed motion for judgment of acquittal, if only to prevent a miscarriage of justice and to avoid undoing a conviction that was lawfully obtained.” [5] Brookins argues that Guardar-rama is distinguishable for two reasons: first, in his case the Superior Court made its decision based on the State’s “untimely” submission; and second, the new trial requested here would not constitute a miscarriage of justice.
The record reflects, however, that the facts in Brookins’ case bear close resemblance to the facts in Guardarrama. In Brookins’ case, the prosecutor wrote to the trial judge under Criminal Rule 45(b)(1),[6] seeking additional time to respond, and giving reasonable explanations for the continuance request.[7] The State’s response was filed within the period of time requested by the prosecution, and Brookins filed a reply to that answer. Brookins cites no authority for his claim that the Superior Court abused its discretion by making no inquiry or issuing any decision on the request for the continuance. Here, as in Guardarrama, the Superior Court was empowered “to prevent a miscarriage of justice and to avoid undoing a conviction that was lawfully obtained”[8] by denying Brookins’ motion for default judgment and proceeding to address the merits of his motion for a new trial.
Alternatively, Brookins claims that the State’s request for the continuance constituted an improper ex parte communication that deprived him of his due process rights. Black’s Law Dictionary defines “ex parte” as something being made by one party: “Done or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested; of or relating to court action taken by one party without notice to the other.”[9] The record reflects the State properly requested an extension before the answer date fixed by the Superior Court. Six days later, Brookins was served with the State’s request for an extension of time, and he filed his objection immediately upon receipt of the letter. Thus, the record does not support Brookins’ contention that an ex parte communication occurred.

DNA Evidence Claim

Under Title 11, § 4504(b) of the Delaware Code, the court may order a new trial if the defendant “establishes by clear and convincing evidence that no reasonable trier of fact, considering the evidence presented at trial, evidence that was available at trial but was not presented or was excluded, and the [DNA evidence] would have convicted.”[10] The crux of Brookins’ argument is that the evidence of what was believed to be his blood on the vase was *393 “the most important piece of evidence,” from which the jurors could determine whether Brookins was present at the scene. Brookins argues that because “it is clear that the testimony at trial that the blood on the vase was of [Brookins’] blood type was clearly erroneous[,]” no reasonable juror could have convicted him.

Microscopic Hair Samples

Brookins’ first argument is that the Superior Court failed to take into account the unreliability of microscopic comparison of hair samples.[11] That argument is contradicted by the record, which shows that the Superior Court evaluated the reliability and credibility of microscopic hair analyses in general and decided nonetheless to credit the microscopic hair comparison analysis in this particular case.[12] We hold that the Superior Court properly rejected the categorical argument that microscopic hair analysis is inherently unreliable. As one federal court has pointed out, “human hair analysis by microscopic comparison was an accepted and rehable scientific method or technique, the results of which were routinely admitted at trial along with other circumstantial evidence....”[13] Broo-kins has not demonstrated that the microscopic hair comparison analysis was unreliable in his specific case. Accordingly, the microscopic comparison of hair samples was properly admitted into evidence at Brookins’ trial and was properly considered in evaluating the strength of his argument based on the new DNA evidence report.

Shoe Print Evidence

Brookins next claims that shoe prints were not sufficient to support a conviction, because the shoeprints were not distinct enough to permit a valid comparison. Specifically, Brookins argues that the FBI agent testified that “the print lacked clarity and sufficient detail to reach a positive opinion.” The FBI agent also testified, however, that he “did find areas that did correspond to [Brookins’ shoe], particularly in regard to the design found in the arch area of the right sneaker.” The FBI agent also confirmed that he found some similarities in the design and size in this case, and “design and portions of the impression that is comparable do correspond in size.” Moreover, the trial judge placed appropriate and limited weight on the shoeprint evidence, and properly held that *394 the shoeprint evidence certainly did not exculpate Brookins.[14] Therefore, the Superior Court did not abuse its discretion by considering the evidence of identification and comparison of shoe prints at Brookins’ trial in evaluating the strength of Brookins’ argument based upon the new DNA evidence report.

Co-Defendant’s Testimony

Although the State had no other eyewitness who could testify that Brookins was present at the time that the murder was committed, his co-defendant Butler gave testimony to that effect. Butler’s testimony was corroborated in several ways, apart from the cross-matched blood samples from the blood-stained vase.[15] Brookins testified that he was present in downtown Wilmington with Debbie Benson (“Benson”) from 12:45 p.m. until 3:30 p.m. (the time of the slaying). However, Benson also testified that Brookins was with her all afternoon on April 2. Benson’s testimony was inconsistent with a written statement she gave to detectives after Brookins was arrested. In that statement, Benson told detectives that Brookins had left the apartment about 1:00 p.m., and she next saw him about 5:30 p.m. Brookins also explained that he had cut his hand when he fell while playing handball with Jones Eric (“Eric”). Moreover, Eric admitted that he had lied when he (Eric) told Broo-kins’ counsel that he could corroborate Brookins’ account of the hand injury. Erie also testified that he had received a threatening phone call.

Other Evidence Sufficient

The record reflects that Brookins’ argument overemphasizes the weight of the new DNA test results relating to the blood on the vase and overlooks the uncontra-dicted circumstantial evidence supporting his convictions. Although no single item of evidence, viewed in isolation, may have been sufficient to convict Brookins, the physical evidence and the testimony of other witnesses, taken together, were sufficient to support a jury finding that Broo-kins was present at the scene and was guilty of the crimes charged beyond a reasonable doubt. As the Superior Court held:
It is not likely that [the DNA evidence] would change the result even if a new trial was granted.... the evidence was substantial ... a reasonable jury would not — could have reached the same conclusion and was likely to reach the same conclusion given quantity and sufficiency of the evidence, even in light of the DNA test results.
Accordingly, we hold that the Superior Court did not abuse its discretion in refusing to grant Brookins’ motion for a new trial based upon the new DNA report concerning the blood on the vase.

*395
Conclusion

The judgment of the Superior Court is affirmed.

. Brookins’ convictions were affirmed in an earlier appeal. See Lampkins v. State, 465 A.2d 785 (Del. 1983).

. Section 4504(b) of Title 11 of the Delaware Code provides:
Except at a time when direct appellate review is available, a person convicted of a crime who claims that DNA evidence not available at trial establishes the petitioner’s actual innocence may commence a proceeding to secure relief by filing a motion for a new trial in the court that entered the judgment of conviction. The court may grant a new trial if the person establishes by clear and convincing evidence that no reasonable trier of fact, considering the evidence presented at trial, evidence that was available at trial but was not presented or was excluded, and the evidence obtained pursuant to subsection (a) of this section would have convicted the person.
Del.Code Ann. tit. 11, § 4504(b) (2001).

.The following facts are summarized from Lampkins v. State, 465 A.2d 785, 786-87 (Del.1983).

. 911 A.2d 802, 2006 Del. LEXIS 537 (Del. Supr.2006).

. Id. at *13.

. Superior Court Criminal Rule 45(b)(1) reads as follows:
When an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice, order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order ....
Del.Super. Ct.Crim. R. 45 (1992).

. In the letter the prosecutor wrote to the trial judge in order to ask for the additional time to file the answer, the prosecutor stated that "[a]s I was not the original prosecutor and due to the age of case, I am requesting an extention [sic] of 45 days to respond to this motion.”

. Guardarrama v. State, 911 A.2d 802, 2006 Del.LEXIS 537, at * 13 (Del.Supr.2006).

. Black’s Law Dictionary 616 (8th ed.2004).

. Del.Code Ann. tit. 11, § 4504(b) (2001).

. On appeal, Brookins contends that an article finding an error rate of over 11% in microscopic hair analysis, and a report "from the national Innocence Project’s Website showed that of the first 70 cases exonerated by DNA analysis, 21 (over 26%) had positive comparisons for microscopic hair analysis.”

. The trial judge opined that:
[The defense counsel cited] two Internet articles.... That is not exactly what I call an authoritative source, with all due respect to the Innocence Project. It’s like preaching to the choir. What I expect you to present talking about, I mean, I understand what they have done or what you say they have done which I believe was relayed to you. My point is; has it been accorded some weight, some something by a court of law, and I don’t think you have that.... I am not saying [the microscopic hair comparison] is good, bad, or indifferent. I am simply saying it has not been debunked. It may or may not be accorded [the] same weight as fingerprint analysis, or anything along lines that have been established over the years. I am simply saying you said because the Innocence Project — each case is different — said they gotten results, which I don’t dispute. It does not necessarily mean without any particular cite or any reference to individual cases that I can do anything.

.McCall v. Peters, 74 Fed.Appx. 389, 2003 U.S. Dist. LEXIS 8038, at *20-21 (N.D.Tex.).

. The trial judge stated that:
Didn't [the FBI agent] say it was similar — it is kind of like I don't know what sneaks anybody has, let’s say I assume they still sell Nike somewhere, and that to say, I had on the Nike, and the murderer had on Nike, simply means that I am within the realm of that universe, it doesn’t mean I did it or did not do it. If I had on an Adidas, and this was clearly a Nike shoe, it is like the old blood test for paternity back in the day, it could exclude you, but the fact that it in-eluded you did not necessarily mean that you were the father. That is the way I looked at that footprint testimony. They had on similar sneakers therefore he was still — like after voir dire, he was still in the panel to be picked, does not mean he was going to be selected, but that is kind of — it meant all that means.

. See Lampkins v. State, 465 A.2d 785, 787-88 (Del.1983).