Paul ROBERTSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Kenneth RODGERS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

James E. LLEWELLYN, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Christopher D. LONG, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: June 14, 1993.
Decided: Aug. 11, 1993.

Jerome M. Capone, Wilmington, for appellant Paul Robertson.

Joseph M. Bernstein, Wilmington, for appellant James E. Llewellyn, Jr.

Bernard J. O'Donnell and Brian J. Bartley, Asst. Public Defenders, Wilmington, for appellant Christopher Long.

Laurence I. Levinson, Wilmington, for appellant Kenneth Rodgers.

Richard E. Fairbanks, Jr. (argued), Timothy J. Donovan, Michael McTaggart, Loren C. Meyers and Stephen M. Walther, Dept. of Justice, Wilmington, for appellee, State of Del.

Before VEASEY, C.J., HORSEY and HOLLAND, JJ.

HOLLAND, Justice:

Kenneth Rodgers ("Rodgers"), James Llewellyn ("Llewellyn"), Christopher Long ("Long") and Paul Robertson ("Robertson") were indicted jointly and tried together on charges stemming from an armored car robbery and the murders of two guards. The trial commenced on September 4, 1991. On October 11, 1991, the jury found Long, Rodgers and Llewellyn guilty of two counts of Murder in the First Degree pursuant to 11 *Del.C.* § 636(a)(1), two counts of Murder in the First Degree pursuant to 11 *Del.C.* § 636(a)(6), one count of Robbery in the First Degree, five counts of Possession of a Deadly Weapon During the Commission of a Felony, two counts of Conspiracy in the First Degree and one count of Conspiracy in the Second Degree. The jury found Robertson not guilty of two counts of Murder in the First Degree pursuant to 11 *Del.C.* § 636(a)(1), but guilty as to all of the other offenses of which his co-defendants were convicted. The defendants were sentenced to be imprisoned for life, without probation or parole, for each murder conviction and received consecutive sentences for the other convictions.

All of the defendants have filed timely direct appeals with this Court. The cases have been consolidated. The defendants [1] all contend that they were tried in violation of their rights pursuant to the equal protection clause of the Fourteenth Amendment to the United States Constitution and the impartial jury clause of Article I, Section 7 of the Delaware Constitution, when the State allegedly exercised its peremptory challenges in a racially discriminatory manner.

Several other issues have also been presented to this Court. Llewellyn and Rodgers argue that they cannot be convicted of more than two counts of Possession of a Deadly Weapon During the Commission of a Felony where the evidence was undisputed that only two weapons were involved in the crime. Robertson also contends: (1) the Superior Court committed plain error by not *sua sponte* severing his trial from that of his co-defendants; (2) the remarks made by the prosecutor in rebuttal prejudiced Robertson's right to a fair trial; (3) the Superior Court committed plain error by sentencing him for two counts of Possession of a Deadly Weapon During the Commission of a Felony and two counts of Conspiracy in the First Degree, after the jury found him not guilty of the underlying two counts of Intentional Murder in the First Degree; and (4) that none of his convictions is supported by sufficient evidence.

We have concluded that all of the defendants' contentions are without merit. Therefore, the judgments of conviction challenged by this appeal are affirmed.

### Facts

On the morning of December 12, 1990, a Brooks Armored Car was making a regularly scheduled delivery to the Delaware Trust branch office located at the intersection of Route 13 and Bacon Avenue near Wilmington. The armored car company usually delivered $500,000 to the bank between 10:30 a.m. and 12 noon every Wednesday. Because of an anticipated increase in holiday withdrawals, however, the December 12 delivery totaled $613,000.

---

**1.** Issues which refer to "defendants" are common to all four defendants. Issues which are common to less than all four defendants or to only a single defendant will refer to the specific individual or individuals by name.

The armored car arrived at the bank at approximately 11:00 a.m. It was manned by Vincent Monterosso ("Monterosso"), Michael Salvatore ("Salvatore") and Eugene Ganderton ("Ganderton"). Salvatore parked the armored car near the rear entrance to the bank. A bank employee was waiting there for the delivery.

Salvatore and Monterosso exited the truck. They loaded a handcart with two canvas money bags and several boxes of coins. Monterosso began moving the cart toward the bank. Salvatore followed from the rear. The two guards were then unexpectedly confronted by three men.

The assailants began shooting guns before either guard had time to draw his weapon. The men shot Salvatore and Monterosso at point-blank range. Monterosso and Salvatore both died from their respective gunshot wounds.[2] The assailants grabbed the bags of money and fled in the direction of an alleyway behind the bank and parallel to Route 13.

Robert Rodriguez ("Rodriguez"), was driving past the bank at the time of the robbery. He saw the guards lying on the ground and two men running away from the bank. According to Rodriguez, one of the men was carrying what appeared to be a white satchel or laundry bag. When Rodriguez stopped his vehicle, he could view the alleyway. He observed a man standing outside a yellow Ryder truck hand the satchel to a man inside the truck. Rodriguez reported what he had seen to the police officers who responded to the crime scene.

A report of the robbery and a description of the Ryder truck was broadcast immediately over the police radio. A New Castle County patrolman saw the Ryder truck at approximately 11:19 a.m. traveling north on Interstate 495. A chase ensued. The police pursued the truck north on Interstate 95 into Chester, Pennsylvania, over the Commodore Barry Bridge and into New Jersey. Delaware, Pennsylvania and New Jersey police officers all ultimately participated in the pursuit. During the chase, the police observed weapons being thrown from the truck.

The chase ended in Swedesboro, New Jersey when the Ryder truck crashed into a water tower. Rodgers, Robertson, and Llewellyn were apprehended while attempting to flee on foot. A fourth person, Long, was apprehended inside the rear of the truck.

The police officers searched the Ryder truck. They seized a garbage bag full of money, the money bags used by the armored car company, a bulletproof vest, a 9–mm bullet, a Burger King cup and a box of trash bags. A search of Rodgers' person uncovered a register receipt from a Burger King restaurant located within a few hundred feet of the fatal crime scene.

### Jury Selection

A venire panel of approximately 180 prospective jurors was assembled. The panel was collectively asked various preliminary questions. The names of the panel members who had not been excused were drawn from a ballot box at random and apparently assigned consecutive numbers. The panel was then divided into eight smaller groups, each consisting of approximately twenty-two people, for the purposes of scheduling individual *voir dire*. The foregoing procedure was described by the trial judge:

> After these [preliminary] questions are asked [collectively], the clerk will draw your names at random and assign each of you a number. As your name is drawn, you should come forward and receive the number from the clerk. The group will be broken up into smaller groups with different reporting times.

The attorneys had been provided with juror information sheets, which contained, *inter alia*, the race, age, sex, marital status, employment, and education of each juror. After the jurors names were called

---

**2.** Three bullets were removed from Monterosso's body. Each had been fired from a 9–mm Luger pistol. Two bullets were removed from Salvatore's body. One was fired from a 9–mm Luger pistol; the other was fired from a revolver. Police found 9–mm casings at the scene of the crime.

at random, the attorneys were given a list of the group assignments. These lists informed the attorneys of the time and exact order in which all of the jurors would appear for individual *voir dire*.

*Voir dire* was conducted over four days.[3] The defendants (each of whom is black) contend that the State began exercising its peremptory challenges in a racially discriminatory manner after the eleventh juror was seated. Following the State's use of a peremptory challenge to remove Annie Watson, a black woman, as the potential twelfth juror, the defendants' attorneys raised an objection.

The basis for the objection by defense counsel was that four out of the six peremptory challenges previously exercised by the State had removed black women as the potential twelfth juror. The defense argued that pattern established a *prima facie* case that the State was using its peremptory challenges in an improper racially discriminatory manner. The State responded, as follows, to that objection by defense counsel before the Superior Court made any ruling:

> Your Honor, I think perhaps the quickest response is if the State was engaging in a racist selection process, the State would not have challenged juror William White [a white male]. The jury would have been drawn. We would have had the 12 jurors at that particular point in time.

> . . . . .

> A more lengthy explanation is that the State had numerous challenges going into this afternoon's selection process. And the State, with its number of challenges, believed that the State could get well down into the list this afternoon, specifically attempting to seat juror Raymond Brown, who appears to be, to the State, the most ideal juror, in that he is a blue-collared, mature individual, who has friendships with a trooper and whose spouse is identified as being a bank clerk. That particular juror seems to the

State to be an ideal candidate, one who might be most favorably receptive to the State's theory of the case. It has absolutely nothing to do with the jurors who were challenged. It's just that this particular juror is more desirable. And the State had adequate peremptory challenges to attempt to seat the juror most favorable to its case.

> By the same token, the State likewise challenged Denise Radzius [a white female]. It's simply a matter of having the challenges to attempt to seat the most favorable juror as opposed to seeking to eliminate any minorities.

The trial judge advised the parties that he would hear argument on the defendants' objection the next morning.

The selection process continued. The first prospective juror called after the defendants' objection was also a black woman. The State used a peremptory challenge to remove her from the jury. Defense counsel renewed their prior objection.

Raymond Brown, the State's "ideal juror," was ultimately called for individual *voir dire*. It was then determined that he was a client of one of the defense attorneys. Therefore, he was excused for cause. The jury was finally empaneled when Margaret Brown, a black woman, was seated without a challenge, as juror number twelve.

The trial judge heard argument on the defendants' objection the following day. The trial judge found the State's explanation for the use of its peremptory challenges to be race-neutral. The trial judge also found no purposeful intention to discriminate on the basis of race by the State in exercising its peremptory challenges.

## PEREMPTORY CHALLENGES

### Racial Discrimination Alleged

The defendants all contend that the State exercised its peremptory challenges in a racially discriminatory manner, in violation

---

3. Each group was assigned a day and time to return to court over the four day period. A group was assigned for voir dire every morning and another each afternoon. This procedure was arranged for the convenience of the prospective jurors.

of the equal protection clause of the Fourteenth Amendment to the United States Constitution and the impartial jury clause of Article I, Section 7 of the Delaware Constitution. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Riley v. State,* Del.Supr., 496 A.2d 997 (1985). One year before the seminal case of *Batson,* this Court "set out in general terms a procedure for trial courts to follow ... when they are fairly presented with a claim that peremptory challenges have been exercised on discriminatory grounds." *Riley v. State,* 496 A.2d at 1012–13. The procedures outlined by this Court in *Riley,* pursuant to Article I, Section 7 of the Delaware Constitution,[4] are consistent with the procedures enunciated by the United States Supreme Court in *Batson. Feddiman v. State,* Del.Supr., 558 A.2d 278 (1989). We have concluded that, in this case, an examination of the application of the *Batson* procedures is dispositive.

In *Batson,* the United States Supreme Court established a tripartite analysis for evaluating claims that a prosecutor has used peremptory challenges in a racially discriminatory manner.

**First,** the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race.... **Second,** if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.... **Finally,** the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination....

*Hernandez v. New York,* — U.S. —, —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (emphasis added) (citation omitted).

The defendant bears the initial burden of making a *prima facie* showing that the

State purposefully exercised its peremptory challenges in a racially discriminatory manner.

To establish such a case, the defendant **first** must show that he is a member of a cognizable racial group, ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. **Second,** the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ... **Finally,** the defendant must show that these facts and any other relevant **circumstances raise an inference** that the prosecutor used that practice to exclude the veniremen from the ... jury on account of their race.

*Batson v. Kentucky,* 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis added) (citations omitted).

■ In these proceedings, the defendants claimed that the prosecutor had used a disproportionate number of peremptory challenges to remove venire members who, like the defendants, were black. It was unnecessary for the Superior Court to determine whether the defendants had carried their initial burden of making a *prima facie* case, because the prosecutor responded by denying a race-based removal motive and offering a race-neutral explanation for his exercise of the State's peremptory challenges. *Feddiman v. State,* 558 A.2d at 285–86; *Baynard v. State,* 518 A.2d at 687–88; *Hernandez v. New York,* — U.S. at —, 111 S.Ct. at 1866.

### Race–Neutral Explanation

■ The prosecutor "must articulate a neutral explanation related to the particu-

---

**4.** The underlying principles of the three-tier test set forth in *Riley,* to determine the defendant's rights under Article I, § 7 of the Delaware Constitution, are:

 (1) the presumption that the State is exercising its peremptory challenges for constitutionally permissible purposes, subject to a *prima facie* showing to the contrary; (2) a find-

ing of substantial likelihood whether the State is exercising its challenges on the basis of race; and (3) if so found, whether the State has then met its burden of proving that the exercised challenges were not racially motivated.

*Baynard v. State,* Del.Supr., 518 A.2d 682, 687 (1986).

lar case to be tried." *Batson v. Kentucky,* 476 U.S. at 98, 106 S.Ct. at 1724; *Feddiman v. State,* 558 A.2d at 285. However, the prosecutor's explanation need not rise to the level of a strike for "cause." *See Riley v. State,* 496 A.2d at 1013. Justice O'Connor has stated:

> Absent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all. The peremptory challenge is "as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose."

*Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1874 (quoting *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)) (O'Connor, J., concurring). The prosecutor's explanation in the case *sub judice* was the State's attempt to seat its "ideal" juror.

The record reflects the prosecutor's rationale in exercising the State's peremptory challenges. After the first eleven jurors had been seated, the State still had a significant number of peremptory challenges. The prosecutor determined to use his remaining peremptory challenges to seat an "ideal" juror. In reviewing the information available from the juror cards, the prosecutors concluded that ideal juror would be Raymond Brown. The prosecutor identified four characteristics which made Raymond Brown the State's "ideal" juror: (1) he was a "blue-collared" worker; (2) he was a "mature individual"; (3) he had a friendship with a police officer; and (4) he had a spouse who was identified as being a bank clerk. According to the prosecutor, since the exact order in which the jurors would be called for individual *voir dire* had been pre-disclosed, he had decided to use the State's remaining peremptory challenges to remove any juror, regardless of race, in an effort to seat Raymond Brown.

In response to the prosecutor's remarks, the defendants argued that the State's explanation was pretextual. The defendants noted that many of the jurors, who the

State had removed peremptorily, shared some of the characteristics which the State attributed to its "ideal" juror. For example, the defendants pointed out to the Superior Court that Maggie Griffin, a black female, had been removed by the State even though, like Brown, she was a mature, blue-collar worker with police officer friends. The prosecutor consistently responded that it was the combination of all four factors, including a spouse who works in a bank, which made Raymond Brown its "ideal" juror.

### Clearly Erroneous Standard Trial Judge's Factual Determination

"Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, '[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination.'" *Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1868 (quoting *Batson v. Kentucky,* 476 U.S. at 98, 106 S.Ct. at 1724.) In *Batson,* it was recognized that the issue of whether a prosecutor intended to discriminate on the basis of race, in exercising peremptory challenges, is a "question of historical fact." *Hernandez v. New York,* —— U.S. at ——, 111 S.Ct. at 1869–1870. The *Batson* opinion also "explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Id.* at ——, 111 S.Ct. at 1868. After a comprehensive analysis of many possible standards of appellate review, the United States Supreme Court held, in *Hernandez,* that it would not overturn the "trial court's finding on the issue of discriminatory intent unless convinced its determination was clearly erroneous." *Id.* at ——, 111 S.Ct. at 1871. *Accord Baynard v. State,* 518 A.2d at 688. The rationale for that holding in *Hernandez* was carefully explained:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson,* the finding will "largely turn on evaluation of credibility." 476 U.S., at 98, n. 21, 106 S.Ct. at

1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York*, —— U.S. at ——, 111 S.Ct. at 1869. *Accord Feddiman v. State*, 558 A.2d at 286–287; *Baynard v. State*, 518 A.2d at 688. *See also United States v. Uwaezhoke*, 995 F.2d 388 (3d Cir. 1993).

### Superior Court's Batson Analysis Upheld

The Superior Court accepted the prosecutor's explanation and found that he had not intentionally exercised the State's peremptory challenges in a racially discriminatory manner:

> I do not find that any exercise of peremptory challenges by the State were intentionally race oriented.... I do not believe that the State exercised those challenges with the purpose of excluding black females. I don't think that [the prosecutor] had a conscious intent to strike black females. I do think that [the prosecutor] had an intent to get to Raymond Brown, and I believe the State's explanation. You wanted Raymond Brown. And you may have challenged everybody and anybody. Unless a better Raymond Brown appeared between challenge 15 and challenge 22, [the prosecutor was] going to get Raymond Brown. That was your purpose in challenging six females, five of them being black. I find that to be your purpose.

In this case, as in *Hernandez*, the trial judge believed the prosecutor's race-neutral explanation for exercising the State's peremptory challenges. The Superior Court rejected the defendants' assertions that the State's articulated reasons were pretextual. The Superior Court found no intent to discriminate on the basis of race.

The record supports the Superior Court's ultimate finding. First, the composition of the first eleven jurors (three black males, four white females, and four white males) supports a determination that the State had not previously attempted to exclude blacks or women from the venire. Second, in addition to the five black women who were challenged, the State also peremptorily challenged a white woman and a white male, in an attempt to seat Raymond Brown. None of those individuals had all four of the race neutral characteristics which made Brown the State's "ideal" juror. Finally, although the State still had two peremptory challenges after Raymond Brown was excused for cause, it did not remove Margaret Brown, the black woman who was called after Raymond Brown and ultimately seated as juror number twelve, even though the next individuals to be called in the list of jurors were white.

We have concluded that the record reflects that the Superior Court properly applied the tripartite *Batson* analysis. First, it was unnecessary for the Superior Court to determine that a *prima facie* showing had been made by the defendants' allegation of racial animus, because the prosecutor volunteered to explain the rationale behind the exercise of its peremptory challenges. Second, the record supports the Superior Court's determination that the explanation given by the prosecutor was race neutral. Third, the trial court's ultimate finding of no discriminatory intent was not clearly erroneous. *Batson v. Kentucky*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *Hernandez v. New York*, —— U.S. at ——, 111 S.Ct. at 1869. *Accord Feddiman v. State*, 558 A.2d at 286–287; *Baynard v. State*, 518 A.2d at 688. *See also United States v. Uwaezhoke*, 995 F.2d 388 (3d Cir. 1993).

### Individual Voir Dire Need for Procedural Change

The State's ability to articulate a race-neutral explanation for exercising its

peremptory challenge, based upon the likelihood of seating its definition of an "ideal" juror, is unique to this case because the precise order of juror selection had been pre-disclosed to the attorneys. The State's race-neutral explanation in this case has withstood careful judicial scrutiny by the Superior Court and this Court. In the future, however, it is important to eliminate the potential for compromising the random selection of jurors. 10 *Del.C.* § 4501. That potential exists when the precise order for individual *voir dire* is made known to the attorneys in advance of a potential juror's actual appearance.

The usual jury selection procedure involves collective *voir dire* only and does not pre-disclose the exact order in which all members of the venire will be called to the jury box. Super.Ct.Crim.R. 24(b)(3). Accordingly, we direct the Superior Court to promulgate a rule which will accommodate the need to conveniently schedule the jurors' appearance for individual *voir dire* and at the same time preserve the integrity of the random jury selection process by keeping the jurors' order of appearance confidential. 10 *Del.C.* § 4507. In the interim, the following procedures for scheduling the *individual voir dire* of jurors should be used:

(1) When the names of the petit jurors are written on "distinct ballots," those ballots should also be numbered.

(2) The Prothonotary should prepare a master list of the jurors' names and corresponding ballot numbers, which information shall remain confidential until jury selection has been completed.

(3) If the presiding judge decides to schedule groups of jurors to appear at designated times, as in the case *sub judice,* the ballots should be drawn in open court, but only the number on the ballot should be announced.

(4) After the entire venire has been drawn and reporting groups have been established, the Prothonotary should notify each juror, confidentially, of his or her time to appear for individual *voir dire.*

(5) If there is a need to have individual *voir dire* for more than one trial during a venire panel's term of service, different numbers should be assigned to each juror for each trial.

## *LLEWELLYN'S AND RODGER'S CLAIM*

### *Multiple Convictions Deadly Weapon Possession*

■ Llewellyn and Rodgers were convicted of five counts of Possession of a Deadly Weapon During the Commission of a Felony based on the possession of a gun during the commission of four counts of Murder in the First Degree and one count of Robbery in the First Degree. 11 *Del.C.* § 1447.[5] Each of them contends that he was improperly convicted of more than two counts of the deadly weapon offense because the State's evidence established that only two guns were involved in the commission of the five underlying felonies. In support of their argument, Llewellyn and Rodgers cite *Reader v. State,* Del.Supr., 349 A.2d 745 (1975). Their reliance upon *Reader* is misplaced.

This Court has previously determined the question presented by Rodgers and Llewellyn in deciding the case of *Pauls v. State,* Del.Supr., 554 A.2d 1125 (January 12, 1989) (ORDER). In *Pauls,* the defendant argued that "his conviction for multiple counts of possession of a deadly weapon during the commission of a felony, one count for each weapon possessed during *each* felony, [was] contrary to the legislative intent underlying the statute." (emphasis added) The defendant in *Pauls* also relied upon *Reader.* This Court rejected that contention.

The determinative consideration in evaluating a challenge to cumulative punishments and prosecutions is legislative intent. *Wyant v. State,* 519 A.2d 649, 661 (1986).

---

**5. § 1447. Possession of a deadly weapon during the commission of a felony; class B felony.**
(a) A person who is in the possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during the commission of a felony.

Section 1447 states that a person "who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during the commission of a felony." In *Pauls*, this Court held that separate convictions for a deadly weapon offense, for each felony the defendant committed while in possession of a deadly weapon, is consistent with the deterrence goal of the statute and that such multiple weapon convictions were supported by the statute's plain language. 11 *Del.C.* § 1447. Therefore, Llewellyn and Rodgers could properly be convicted of more than two counts of Possession of a Deadly Weapon During the Commission of Felony, even though only two weapons were used, when multiple felonies were committed with those two weapons.

### *ROBERTSON'S CLAIMS*

#### *Joint Trial Not Plain Error*

■ Robertson contends that the trial judge abused his discretion by not ordering, *sua sponte*, that Robertson's trial be severed from the trial of his co-defendants. Ordinarily, defendants indicted together should be tried together. *Jenkins v. State*, Del.Supr., 230 A.2d 262, 272 (1967). However, if justice requires it, the trial judge should grant separate trials. *Id.*

■ Severance is a matter addressed to the sound discretion of the trial judge. *Id.* What constitutes an abuse of discretion depends upon the peculiar facts and circumstances of each case. *Id.* at 272–73. As a general rule, discretion may be said to be abused when there is a reasonable probability that substantial injustice and denial of a fair trial may result from a joint trial. *Id.* at 273. Examples of the factors to be considered by the trial judge are: (1) *Bruton* [6] problems relating to co-defendants' extra-judicial statements; (2) absence of other substantial, competent evidence of the defendant's guilt; (3) antagonistic defenses between co-defendants; and (4) difficulty of segregating the evidence as between the complaining defendant and other co-defendants. *Jenkins v. State*, 230 A.2d at 273.

■ In this case, Robertson acknowledges that, of the foregoing list of factors to be considered, (1) and (3) are not at issue. According to Robertson, however, there was not substantial independent evidence of his guilt. As a corollary, he contends that the jury would have difficulty segregating the evidence against him at a joint trial. The standard and scope of appellate review concerning the trial judge's failure, *sua sponte*, to sever Robertson's trial from that of his co-defendants is plain error. *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986).

■ A disparity in the evidence presented against each defendant does not *ipso facto* require separate trial. *See Lampkins v. State*, Del.Supr., 465 A.2d 785, 794–95 (1983). *Accord, e.g., United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); *United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir.1982), *cert. denied*, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983). Moreover, the record does not support Robertson's contention that the disparity in the evidence as between him and the other defendants was so significant as to deprive him of a fair trial. The State presented a substantial amount of circumstantial evidence to prove its case against Robertson.

Based upon the State's evidence, the jury could reasonably infer that Robertson's three co-defendants had approached the bank and a fourth person had stayed with the Ryder truck. Given the State's evidence about the short amount of time which had elapsed before the police started to pursue the Ryder truck, the jury could reasonably believe that it was unlikely that the three other men had committed the robbery and then had stopped somewhere during their flight to pick up Robertson. Therefore, since Robertson was seen emerging from the Ryder truck at the end of the chase, the jury could infer that he was the fourth suspect.

6. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The State's evidence also demonstrated that while Robertson's three co-defendants were near the bank during the murder and robbery, the Ryder truck had been moved. The jury could reasonably conclude, based upon Robertson's presence in the truck at the end of the chase, that Robertson had moved the truck while the murders and the robbery were being committed. The jury could also reasonably find that Robertson had moved the truck into the alley with an intent to facilitate the crimes.

After the chase, the record reflects that Robertson attempted to flee, a fact which was admitted into evidence as an indication of his guilt. *Thomas v. State*, Del.Supr., 467 A.2d 954, 958 (1983); *Tice v. State*, Del.Supr., 382 A.2d 231, 233 (1977). When Robertson was apprehended, he stated, "Times were tough. It was done for Christmas." Based upon that remark, the jury could reasonably infer that Robertson knew the robbery was being committed. Thus, we have concluded that there was sufficient evidence presented by the State to support the trial judge's decision not, *sua sponte*, to order a separate trial for Robertson. *See Skinner v. State*, Del. Supr., 575 A.2d 1108, 1119–20 (1990). *Compare Bradley v. State*, Del.Supr., 559 A.2d 1234, 1241 (1989).

Robertson's contention that the jury would not be able to consider the criminal culpability of each defendant separately at a joint trial is also not supported by the record. The jury was specifically instructed to consider the liability of each defendant separately. *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). The jury was also instructed that evidence admitted against only one defendant was not to be used in determining the guilt of the other defendants. *Skinner v. State*, 575 A.2d at 1120; *Lampkins v. State*, 465 A.2d at 795. *See also United States v. Cresta*, 825 F.2d 538, 554–55 (1st Cir.1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). The jury acquitted *only* Robertson of intentional murder. That outcome suggests that the jury was, in fact, able to segregate and consider the evidence separately as to Robertson.

Robertson has failed to demonstrate that any disparity in the evidence as between him and his co-defendants was so substantial as to deprive him of a fair trial. Robertson's contention that the jury would be unable to consider the criminal liability of each defendant separately is refuted by the fact that the jury acquitted only Robertson of intentional murder. Thus, the record reflects that the trial judge did not commit plain error by not, *sua sponte*, severing Robertson's trial from that of his co-defendants.

### Robertson's Sandbagging Allegation

 Robertson's next challenge is to the propriety of the prosecutor's rebuttal summation, which Robertson characterizes as "sandbagging." During the State's rebuttal summation, Llewellyn's attorney objected on the basis that the State's argument was "sandbagging" and moved for a mistrial. *See Bailey v. State*, Del.Supr., 440 A.2d 997 (1982). Robertson's attorney and the attorneys for the other defendants joined in the motion.

Robertson's attorney argued that the prosecutor had made several inaccurate statements about Robertson to which he would have no chance to respond. Robertson's attorney was asked by the trial judge if he was requesting surrebuttal at that point. Robertson's attorney responded "no". Although the trial judge refused to grant a mistrial, he cautioned the prosecutor: "I have to agree with the defense that your rebuttal sounds more like a summation rather than a rebuttal, and if it continues, I will be forced to give the defendants surrebuttal." The prosecutor proceeded and concluded his remarks to the jury without further objection.

 The standard of appellate review regarding the trial judge's action following an objection that the prosecutor engaged in "sandbagging" is abuse of discretion. *Bailey v. State*, 440 A.2d at 1003. In discharging its function of appellate review of such matters, this Court has adopted a three-

part analysis. *Hughes v. State*, Del.Supr., 437 A.2d 559 (1981). That analysis examines the centrality of the issue affected by the alleged error, the closeness of the case, and the steps taken to mitigate the affects of the alleged error. *Id.*

In this case, Robertson's attorney joined in the prompt "sandbagging" objection to the prosecutor's rebuttal arguments. The trial judge agreed that the prosecutor's comments sounded more like a summation than a rebuttal and instructed the prosecutor to discontinue that pattern of remarks. When the trial judge denied the motion for a mistrial, Robertson's attorney declined to ask for surrebuttal, despite a direct inquiry from the trial judge on that issue. The prosecutor finished his rebuttal to the jury without further objection. Robertson's attorney made no subsequent application for either surrebuttal or a curative instruction. The record reflects no abuse of discretion. *Bailey v. State*, 440 A.2d 997; *Hughes v. State*, 437 A.2d 559.

### Robertson's Conspiracy Convictions

■ Robertson contends the trial court committed plain error by sentencing him for Conspiracy in the First Degree after the jury had found him not guilty of the underlying two counts of Intentional Murder in the First Degree. This Court has held that a "conspiracy conviction [is] not legally inconsistent with an acquittal because ... a conviction is sustainable when the '[defendant] or another person with whom he conspired commits an overt act in pursuance of the conspiracy.'" *Alston v. State*, Del.Supr., 554 A.2d 304, 312 (1989) (quoting 11 *Del.C.* § 512(2)). *See also Stewart v. State*, Del.Supr., 437 A.2d 153 (1981). Consequently, the jury's verdict was not legally inconsistent and the trial court did not commit plain error in sentencing Robertson for the conspiracy convictions. *Id.*[7]

### Sufficiency of Evidence Robertson's Convictions

■ Robertson contends that there was insufficient evidence to establish his guilt beyond a reasonable doubt. The applicable standard of review is well established:

> "Once a defendant has been found guilty of the crime[s] charged, the fact finding role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis supplied). This rule reflects the fundamental tenet of American jurisprudence that the jury is the sole trier of fact responsible for determining witness credibility, resolving conflicts in testimony and for drawing any inferences from the proven facts. *Pryor v. State*, Del. Supr., 453 A.2d 98, 100 (1982).

*Chao v. State*, Del.Supr., 604 A.2d 1351, 1363 (1992) (emphasis added). The evidence presented by the State against Robertson has been recounted in that portion of this decision which considered his claim that his trial should have been severed from that of his co-defendants. The record reflects that there was sufficient evidence to support the guilty verdicts which the jury returned regarding Robertson, when viewed in a light most favorable to the prosecution. *Id.*

### CONCLUSION

The judgments of the Superior Court, which resulted in the convictions of the defendants, are AFFIRMED.

---

**7.** We note that the State has acknowledged that two of Robertson's conspiracy convictions should be vacated. That issue has previously been remanded to the Superior Court during the pendency of this appeal.