Michael JONES, Defendant Below–Appellant

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 482, 2005.

Supreme Court of Delaware.

Submitted: Dec. 7, 2006.

Decided: March 6, 2007.

Jerome M. Capone, Esquire (argued) and Kevin J. O'Connell, Esquire (argued), Wilmington, DE, for Appellant.

Timothy J. Donovan, Jr., Esquire (argued) and Thomas E. Brown, Esquire, Department of Justice, Wilmington, DE, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Defendant–Appellant Michael Jones appeals his Superior Court convictions of three counts of Murder First Degree, Robbery First Degree, Arson Second Degree and related weapons and conspiracy charges. Jones was sentenced to three life sentences without parole on the murder convictions. He argues on appeal that the Superior Court committed eight separate and independent grounds of reversible error. His lead argument is that the prosecutor used peremptory challenges during jury selection in a racially discriminatory manner, contrary to *Batson v. Kentucky.*[1] Because the Superior Court did not address and evaluate all evidence introduced by each side tending to show that race was or was not the real reason for the State's exercise of its peremptory challenges and determine whether the defendant has met his burden of persuasion as mandated by *Batson,* we remand this case so that it is done by the trial court in the first instance. Jurisdiction is retained.

## I. Facts

Cedric Reinford, a/k/a Dreds, ran a large drug ring in Wilmington. In 1999, Dreds was living with Maneeka Plant and was the father of her infant son. Dreds used Maneeka to launder his drug money by purchasing homes in her name. Dreds was grossing hundreds of thousands of dollars each year running his drug business. On November 21, 1999, Dreds' gold Lexus sedan was found on fire with him inside. Dreds had been shot three times in the head, dowsed with gasoline and set

ablaze. It was later determined that Jones was the triggerman.

At 3:20 a.m. that same morning, Mohammad Reinford, Dreds' brother, called 911, reporting that he had been shot in the face and that a woman had also been shot. Police arrived to find Maneeka Plant dead, shot three times, in an upstairs bedroom. Mohammad had suffered a gunshot wound to the head, but remained conscious and later recovered. Maneeka's infant son was also found in the home, but was unharmed. Mohammad explained to police that he and Darrell Page, a/k/a Quazzi, were sitting in Mohammad's basement bedroom smoking marijuana when Quazzi suddenly pulled out a gun and forced Mohammad to open the back door. Michael Jones, a/k/a Gotti then entered the home and shot both Mohammad and Maneeka.

At 7:00 a.m. on November 21, Kim Still received a call from her boyfriend, Quazzi. Kim and Quazzi lived together. Quazzi was one of Dreds' top lieutenants. He told Kim that she needed to go to Philadelphia immediately. When she arrived in Philadelphia, she met with Quazzi and Gotti. While in Philadelphia, Kim was informed by her sister that Police were looking for her and Quazzi. Kim left Quazzi and Gotti and returned to Wilmington, where the police were waiting at her home. The police searched the home and found drugs, a shotgun and ammunition.

Kim was then taken to the Wilmington Police Station for questioning. The last five hours of her interrogation was videotaped. During that time, she told police that Quazzi informed her that he wanted to kill Dreds and steal his drug money, and that he was going to enlist Gotti to do the killing.

During jury selection, the State used six of its eight peremptory strikes to remove

---

1. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

members of minority groups from the jury. Two strikes are notable, as it appears that other white members of the jury possessed the same or similar qualities for which the State struck the minority jurors. We will refer to any individual juror by initial. The State first struck juror Mr. C. The State originally argued that the strike was based upon Mr. C's criminal record, but later argued that the basis for the strike was Mr. C's occupation as a school teacher. The State explained, "based upon my contact with those kinds of people in that profession, I find them more likely to give someone the benefit of the doubt. That was my primary reason for striking Mr. [C]." The State, however, did not strike two other white jurors who were also school teachers.

The second juror struck was Ms. A. The State based its peremptory strike on the fact that Ms. A was "over educated." Further, the State argued that Ms. A was a psychologist, and in the event of a penalty phase, a psychologist would likely be called to testify. The State did not strike a white male school psychologist, however. On appeal the State argues that the difference between the two jurors is that Ms. A was a private practitioner, while the other white juror was only a "school psychologist."

According to the prosecutor, the remaining four minority strikes were based on the jurors' criminal records. Mr. D was struck for having a lengthy rap sheet. The prosecutor disclosed that Mr. D was convicted thirty-years ago for disorderly conduct. Mr. A was also struck because

he had "a pretty bad motor vehicle arrest record."[2] Ms. F was struck by the prosecution because of a twelve year old shoplifting conviction.[3] The final minority juror struck from the jury was Ms. H. The State based this strike on a 1999 conviction for shoplifting. The State declined defense counsel's request to see the jurors' actual criminal records. Once the jury was selected, three of the twelve jurors and one of the four alternates were African–American.[4]

The jury found Jones guilty of three counts of Murder First Degree, Robbery First Degree, Arson Second Degree and related weapons and conspiracy charges. The jury voted, by a count of eleven to one on two Murder First Degree counts and ten to two on the third Murder First Degree count, to sentence Jones to death. Jones was 17 at the time of the killings. Ultimately, he was not eligible for the death penalty due to his age. The United States Supreme Court decided *Roper v. Simmons*, precluding capital punishment of juvenile offenders under 18, before the trial judge's sentencing decision was announced.[5]

Jones first contends that the State exercised its peremptory challenges during jury selection in a racially-discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution[6] and the Impartial Jury Clause of the Delaware Constitution.[7] He makes several addition-

2. Mr. A. had 11 motor vehicle convictions over a period of 20 years.

3. This juror was also arrested in 1987 for possession of heroin, but successfully completed a drug diversion program.

4. During the trial, one of the three African–American jurors was excused because it be-

came apparent that he knew a number of witnesses.

5. 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

6. U.S. CONST. amend. XIV, § 1.

7. DEL. CONST. Art I, § 7.

al arguments.[8] Because we find an incomplete record to review the trial judge's application of *Batson v. Kentucky,* we will not address Jones' remaining arguments at this time.

## II. Discussion

■ Racial discrimination in jury selection compromises a defendant's right to a fair trial and offends the Equal Protection Clause. In addition, "racial minorities are harmed more generally, for prosecutors drawing racial lines in selecting juries establish 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.'"[9] "[T]he very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality' and undermines public confidence in adjudication."[10]

In *Batson v. Kentucky,*[11] the prosecution used its peremptory challenges to strike four African American jurors, resulting in a jury composed of only Caucasian jurors.[12] The United States Supreme Court held that a prosecutor may exercise peremptory challenges "'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried ... [and not based] solely on account of [the jurors'] race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."[13] The Court emphasized that the Sixth Amendment does not require that jurors "mirror the community"; however, the State must not exercise its peremptory challenges on account of race.[14] The *Batson* court mandated a tripartite analysis of a claim that the prosecution used peremptory challenges in a racially discriminatory manner. As this Court explained in *Robertson,* the three analytical steps are as follows:

> First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race.... Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.... Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination....[15]

■ We review *de novo* whether the prosecutor offered a race-neutral explana-

8. Jones also argues that the State violated 11 *Del. C.* § 3507 by admitting Kim Still's testimony about statements made prior to the murder. In a related argument, Jones claims that the trial judge erred by admitting the videotaped testimony of Kim Still made before trial. Jones also argues that the trial judge abused her discretion when she (1) failed to sequester witnesses from police officers who testified about the voluntariness of those witnesses' § 3507 statements in violation of *Barnes v. State,* 858 A.2d 942 (Del. 2004); (2) failed to allow defense counsel to question certain witnesses about bias; (3) wrongfully admitted photographic evidence Cedric's burnt body that was not probative and was cumulative; (4) failed to recuse herself because of alleged statements made at a local restaurant; and (5) improperly denied defense counsel's motion to dismiss and motion for reargument.

9. *Miller–El v. Dretke,* 545 U.S. 231, 237, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)

10. *Id.* at 238, 125 S.Ct. 2317 (citing *Powers v. Ohio,* 499 U.S. 400, 412, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

11. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

12. *Id.* at 82–83, 106 S.Ct. 1712.

13. *Id.* at 89, 106 S.Ct. 1712.

14. *Id.* at 86 n. 6, 106 S.Ct. 1712.

15. *Robertson v. State,* 630 A.2d 1084, 1089 (Del.1993).

tion for the use of peremptory challenges.[16] If we are satisfied with the race-neutrality of the explanation, the trial court's finding with respect to discriminatory intent will stand unless it is clearly erroneous.[17]

■ The defendant has met his initial burden of making a *prima facie* showing that the State purposefully exercised its peremptory challenges in a racially discriminatory manner. In determining whether a defendant has made a *prima facie* showing of discriminatory intent, statistics are relevant.[18] In this case, from an initial pool of 169 jurors a total of 127 were questioned.[19] Twenty-three of those jurors were African–American, three were Asian and one was of Hispanic descent. Thirteen of the twenty-three African–Americans and all three Asian jurors were excused for hardship, leaving a total of eleven minority jurors. The first six minority jurors, five African–Americans and one Hispanic juror, were struck by the State. The State used only two additional peremptory strikes. Thus, the State exercised 75% of its peremptory strikes to remove minorities from the jury.[20] That challenge rate is more than double the percentage of minorities in the original jury pool.[21] Such a statistical disparity supports the first prong of *Batson.*[22]

■ Once the defendant makes a *prima facie* showing of discrimination, the prosecutor "must articulate a neutral explanation related to the particular case to be tried."[23] To rebut the *prima facie* case, "the prosecutor must provide a 'clear and reasonably specific' explanation of 'legitimate reasons' for his use of the challenges that are 'related to the particular case.' "[24] The reasons for the strike need not rise to the level of a strike for cause.[25] In this case, the trial judge found that the prosecutor had offered a race-neutral reason for each of his peremptory strikes.

■ The analysis does not end once the state proffers a race neutral reason. Instead, after the prosecutor offers a race-neutral explanation, the burden shifts back to the defendant to prove purposeful discrimination.[26] At this point the "trial judge assesses the persuasiveness of the facially race-neutral justification by considering the 'totality of the relevant facts.' "[27] "If a prosecutor articulates a basis for a

16. *Barrow v. State,* 749 A.2d 1230, 1238 (Del. 2000).

17. *Id.* at 1239.

18. *"Batson's* citation of *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), in connection with the assessment of a *prima facie* case, *Batson,* 476 U.S. at 96, 106 S.Ct. 1712, indicates that statistical disparities are to be examined." *U.S. v. Alvarado,* 923 F.2d 253, 255 (2d Cir.1991).

19. According to Jones, thirty-two of the 169 jurors were members of a minority cognizable under *Batson.*

20. The State used six of its eight peremptory strikes to strike minorities from the jury.

21. Jones argues that of the entire venire, less than 19% were minorities.

22. In *Alvarado,* the Second Circuit concluded that a challenge rate of two times the minority percentage of the jury pool supported a *prima facie* case under *Batson. Alvarado,* 923 F.2d at 255–56.

23. *Robertson,* 630 A.2d at 1089–90 (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712).

24. *Dixon v. State,* 673 A.2d 1220, 1224 (Del. 1996).

25. *Robertson,* 630 A.2d at 1090.

26. *Dixon,* 673 A.2d at 1224.

27. *Id.* (citing *Hernandez v. New York,* 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." [28] This third analytical step is necessary because the reason offered for each particular strike cannot be viewed in isolation; rather, the plausibility of each explanation "may strengthen or weaken the assessment of the prosecution's explanation as to other challenges." [29]

The third step of the analysis has been further explained by the Third Circuit in *Riley v. Taylor:*

> If [the State's] burden [under step two] is met, the court then addresses and evaluates all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not

the real reason and determines whether the defendant has met his burden of persuasion. [30]

■ The record does not show that the trial judge performed this third step of the analysis. Instead, the trial judge simply noted in response to each *Batson* challenge that the State gave a race-neutral response. [31] We therefore conclude that this case must be remanded for a complete *Batson* analysis.

A remand is consistent with *Gattis v. State,* where this Court decided the Superior Court should consider and decide whether the State improperly exercised peremptory challenges for gender-related reasons "in the first instance." [32] In addition, many, if not most, federal courts have endorsed a remand where a trial court fails to conduct the entire *Batson* analysis. [33] A remand is also consistent with

---

**28.** *Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859.

**29.** *Riley v. Taylor,* 277 F.3d 261, 283 (3d Cir.2001) (citing *Alvarado,* 923 F.2d at 256).

**30.** *Id.* (citing *U.S. v. McMillon,* 14 F.3d 948, 953 n. 4 (4th Cir.1994)). In *Riley,* the Third Circuit reversed a Delaware conviction because this step of the analysis was not completed.

**31.** For example, in response to Jones' first *Batson* challenge after the State struck Mr. C, the court noted "[the prosecutor] gave you a race-neutral reason for why he exercised that challenged. *That is all he has to do at this point."* In response to the State's reason for challenging Mr. A, the trial court said "They've provided—I don't have to delve into it any further." In response to State's reason for striking Ms. F, the court said "I'm satisfied that is a race-neutral reason. It does— it's unfortunate that it's working out this way, but they have a reason and that reason is not invalid. It's a legitimate basis for them to exercise a peremptory challenge. Actually, I thought she would have been a good juror for either one."

**32.** *Gattis v. State,* Del.Supr., No. 37, 1996, Holland, J. (October 15, 1996).

**33.** *See Batson,* 476 U.S. at 100, 106 S.Ct. 1712; *Smulls v. Roper,* 467 F.3d 1108, 1115–16 (8th Cir.2006) (remanding with instructions to "reconstruct the circumstances surrounding [the defendant's] *Batson* challenge to determine whether the prosecutor's strike of [a juror] was racially motivated."); *Brinson v. Vaughn,* 398 F.3d 225, 235 (3d Cir.2005) (remanding for failure to conduct the second step of the analysis); *Hardcastle v. Horn,* 368 F.3d 246, 260 (3d Cir.2004) (remanding to afford the prosecutor an opportunity "to demonstrate that its exercise of peremptory strikes was justified under the *Batson* third step."); *United States v. Randolph,* 205 F.3d 1342 (6th Cir.2000) (TABLE) (determining that a remand for a proper *Batson* analysis was unwarranted because the trial court committed reversible error by admitted certain evidence during trial); *Jordan v. Lefevre,* 206 F.3d 196, 201–02 (2d Cir.2000) (remanding "[b]ecause the court did not make the required determination at the third *Batson* step and ordering a hearing to reconstruct the prosecutor's state of mind at the time of jury selection"); *Alvarado,* 923 F.2d at 256 (remanding for the trial court to conduct a proper *Batson* analysis);

**634**

*Riley*[34] and *Batson* itself.[35]

■ Critical to any decision applying *Batson* are determinations of credibility and historical fact. A trial court's direct contact with the witnesses allows for accurate determinations of both. In addition to determining the credibility of the prosecutor's representations, a fact finder may consider other factors to determine whether the prosecutor acted with discriminatory intent. They include, but are not limited to:

> The percentage of African American veniremembers who are the subject of the prosecutor's peremptory strikes; (2) side-by-side comparisons of some black venire panelists who were struck and white panelists who were allowed to serve in order to determine whether a prosecutor's proffered reason for strik-

ing a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve; (3) the prosecutor's use of procedural mechanisms ... to move African American veniremembers to the back of the panel where they are less likely to be selected; evidence of a contrast between the prosecutor's voir dire questions posed respectively to black and nonblack panel members ... and (5) evidence of a systematic policy or practice within the prosecutor's office of excluding minorities from jury service.[36]

In addition, "the prosecution's decision not to use an available challenge against minority veniremen is also a relevant circumstance to be weighed." [37]

As the Fourth Circuit explained in *Unit-*

---

**34.** In *Riley*, reversal was required, according to the Third Circuit, because "the state courts failed to examine all of the evidence to determine whether the State's proffered race-neutral explanations were pretextual." *Riley*, 277 F.3d at 286–87. While the opinion certainly suggests that we *may* engage in the *Batson* analysis on our own, it does not in any way *require* it. The Third Circuit actually considered remanding the case to a federal hearing judge to make the findings required to perform step three of the analysis. It ultimately did not do so because *both* Riley and the State conceded at argument that simply too much time had passed for any court to make such findings. *Id.* at 293. A remand has been the remedy in more recent Third Circuit cases. *See Brinson*, 398 F.3d at 235; *Hardcastle*, 368 F.3d at 260.

**35.** *Batson*, 476 U.S. at 99–100, 106 S.Ct. 1712 (remanding because prosecutor was not required to give a race neutral explanation for the peremptory strike).

**36.** *United States v. Nelson*, 450 F.3d 1201, 1207–08 (10th Cir.2006) (citing *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)).

**37.** *Alvarado*, 923 F.2d at 256.

*United States v. Hill*, 146 F.3d 337, 342–43 (6th Cir.1998) (remanding for failure to conduct third step of *Batson* and explaining that it could not properly review the decision "[w]ithout a fuller indication of the circumstances that apparently led the district court to [its] conclusion."); *see also Moran v. Clarke*, 443 F.3d 646, 653 (8th Cir.2006) (affirming, but instructing trial court to carefully articulate the basis for its *Batson* decision in the future); *U.S. Xpress Enters., Inc. v. J.B. Hunt Transport, Inc.*, 320 F.3d 809, 814 (8th Cir.2003) (same); *U.S. v. Castorena–Jaime*, 285 F.3d 916, 929 (10th Cir.2002); *United States v. Perez*, 35 F.3d 632, 636 (1st Cir. 1994).

Some appellate courts, notably the 9th Circuit, have conducted the third step on their own without a remand. *See, e.g., Brown v. Sue del Papa*, 2006 WL 3267778 (9th Cir.) (concluding that "had the state court applied *Batson* in a reasonable manner, it would have discovered that the prosecutor's proffered justifications were unsupported, or even contradicted, by the record."); *U.S. v. Alanis*, 335 F.3d 965, 969 (9th Cir.2003) (reversing because if the trial court had engaged in the third step of the analysis, "it would have concluded that the prosecutor's gender-neutral explanations were pretexts for purposeful discrimination.").

ed States v. Joe,[38] "the parties are not present before this court to permit us to judge their credibility or to adequately follow-up with our inquiry to further explore the validity of the various arguments the parties may advance."[39] In other words, a cold record can not replace a trial court's credibility determinations.

In *United States v. Perez*,[40] the First Circuit explained the "salutary effects" of the trial court performing the entire *Batson* analysis. "First, it fosters confidence in the administration of justice without racial animus. Second, it eases appellate review of the trial court's *Batson* ruling. Most importantly, it ensures that the trial court has indeed made the crucial credibility determination that is afforded such great respect on appeal."[41] Both the 10th and 8th Circuits have endorsed this rationale and have instructed trial courts clearly to articulate decisions in response to a *Batson* challenge.[42] So do we.

■ A remand in this case is also consistent with the rationale for the standard of review applied to *Batson* challenges. We review whether the prosecutor offered a race neutral reason for the strike *de novo*. However, we apply a more deferential standard of review to the trial court's ultimate conclusion on discriminatory intent. That is, where the trial court prop-

erly conducts the three part *Batson* analysis, we review its findings under a clearly erroneous standard of review.[43] This deferential standard of review is applicable because intent to discriminate is "a pure issue of fact."[44] The United States Supreme Court in *Hernandez* explained the wisdom of a deferential standard for reviewing the issue of discriminatory intent:

Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, *and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."*[45]

As the United States Supreme Court further stated in *Anderson v. City of Bessemer City, N.C.*:

The rationale for deference to the original finder of fact is not limited to the

38. 928 F.2d 99, (4th Cir.1991).

39. *Id.* at 103–04 ("Defendants urge us to conduct a review of the reasons offered by the government and determine in the first instance whether it exercised its strikes in a discriminatory manner.... We are not well positioned to conduct this important analysis with only a cold record and without the benefit of findings and supporting reasons of the trier of fact.").

40. *Perez*, 35 F.3d at 636.

41. *Id.*

42. *See Castorena–Jaime*, 285 F.3d at 929; *Moran*, 443 F.3d at 653.

43. *Robertson v. State*, 630 A.2d 1084, 1090 (Del.1993) ("In *Batson*, it was recognized that the issue of whether a prosecutor intended to discriminate on the basis of race, in exercising peremptory challenges, is a 'question of historical fact.' ") (citing *Hernandez*, 500 U.S. at 367, 111 S.Ct. 1859).

44. *Hernandez*, 500 U.S. at 364, 111 S.Ct. 1859 (1991).

45. *Id.* at 365, 111 S.Ct. 1859 (emphasis added).

superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.... When findings are based on determinations regarding the credibility of witnesses ... only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.[46]

In this case, there were no findings of fact with regard to the presence or absence of discriminatory intent. All that the trial judge did was to note that the prosecutor gave race-neutral explanations, but the court did not engage in the type of credibility analysis mandated by *Batson's* third step.[47]

 There is yet another reason that convinces us that a remand is appropriate here. The prosecutor gave alternative reasons supporting the use of at least one of his peremptory challenges.[48] This raises the issue of dual motivation.[49] "Dual motivation analysis grants the proponent of a strike the opportunity to raise an affirmative defense after the opponent of the strike has established a *prima facie* case of discrimination."[50] Once raised, *"the court must consider whether the party whose conduct is being challenged has demonstrated by a preponderance of the evidence that the strike would have nevertheless been exercised ...."*[51] Motivation is a state of mind. Like the three-step *Batson* analysis, the dual motivation inquiry is a factual one, "tak[ing] into account all possible explanatory factors in a particular case."[52] Here, the prosecutor represented that his challenge of Mr. C was in part due to criminal history and in part due to a prior relationship with the Fire Marshall. The credibility of that statement can be determined on remand, and may include an inquiry into the criminal history of empanelled jurors and, if necessary, an *in camera* review of their criminal records (which are not part of the present record). The Superior Court should undertake the analysis of whether the jurors would have been challenged for nondiscriminatory reasons in the first instance.[53]

---

46. 470 U.S. 564, 574–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

47. *See* footnote 31, *supra.*

48. In support of its decision to strike Mr. C, the State explained:
 My concern [with Mr. C], in addition to the [30–year old disorderly conduct conviction and other[48] conviction, was also the fact that it was *[sic]* Fire Marshal's Office that arrested him, and that's going to be very important in this particular case because I have an expert from the Fire Marshal, who is going to give an opinion as to the cause of the fire, but again, I mean, that's not my only reason that I struck Mr. [C]. Although I found him to be a generally honest and concerned person, I used to be a formal school teacher, and I have certain ideas about school teachers, and I have a daughter and a son-in-law who *[sic]* is a school teacher, and based upon my contact with those kinds of people in that profession, I find them more likely to give someone the benefit of the doubt. That was my primary reason for striking Mr. [C].

49. The Third Circuit "agree[s] ... that mixed motive analysis is appropriate in this context." *Gattis v. Snyder,* 278 F.3d 222, 235 (3d Cir.2002).

50. *United States v. Tokars,* 95 F.3d 1520, 1533 (11th Cir.1996); *State v. Gattis,* 1996 Del.Super. Lexis 574, at *14 (Del.Super.).

51. *Jones v. Plaster,* 57 F.3d 417, 421 (4th Cir.1995) (emphasis added).

52. *Gattis,* 1996 Del.Super. Lexis 574, at *15 (citation omitted).

53. This analysis may apply whether or not a prosecutor admits any discriminatory purpose. In *Jones v. Plaster,* the 4th Circuit

## III. Conclusion

Jones' lead argument on appeal is that the State exercised its peremptory challenges in a racially discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Impartial Jury Clause of Article I, Section 7 of the Delaware Constitution.[54] A remand to the Superior Court is required so that factual findings are made on any discriminatory purpose by the prosecutor and if so, the availability, if asserted by the State, of any dual motivation defense.

Among the assignments of error in this appeal is Jones' claim that the trial judge abused her discretion in denying his motion to recuse. This issue is still pending before us. We note that in response to the recusal motion, the trial judge issued a written opinion not only denying the motion but also chastising defense counsel at length for what she viewed to be incompetence and misconduct.[55] Without prejudice to the arguments of the parties on appeal and to avoid complicating the record on the recusal issue, we have concluded that a different judge should address this matter on remand.

We remand this matter for further proceedings consistent with this Opinion. Jurisdiction is retained.

---

Court of Appeals held that dual motivation analysis is required *"[i]f the court concludes, or the party admits, that the strike has been exercised in part for a discriminatory purpose...." Plaster,* 57 F.3d at 421 (emphasis added).

**54.** *Riley v. State,* 496 A.2d 997, 1012 (Del. 1985).

**55.** *See* 2005 WL 950122 (Del.Super.).